JAMES HILL EARLY v. MARGARET B. EARLY.

Western Section.    October 29, 1927.

No petition for Certiorari was filed.

1. **Divorce.   Rejection of offer of reconcilation is desertion.**

Where there are no insurmountable reasons why a husband and wife should not live together, if one of them offers a reconciliation, in good faith, free from improper qualifications and conditions, and within the statutory period of desertion, its rejection amounts to desertion, and this is true, although the party thus refusing to resume the marital relation was not originally the offender, provided that the cause of the separation has been removed.

2. **Divorce.   Evidence.   Evidence held sufficient to sustain ground of desertion.**

Where the evidence showed that the wife left her husband and later wrote him a letter offering to come back and try and live with him, and the husband refused to see her, held sufficient grounds to sustain action of divorce on ground of desertion.

Appeal from Law Court, Shelby County; Hon. H. W. Laughlin, Judge.

Affirmed and remanded.

Chas. A. Johnston, of Memphis, for appellant.

Fitzhugh & Fitzhugh, of Memphis, for appellee.

SENTER, J. The bill for absolute divorce and alimony was filed by Margaret B. Early, who will hereinafter be referred to as petitioner, against James Hill Early, who will hereinafter be referred to as the defendant. The grounds for divorce alleged in the petition, are cruel and inhuman treatment, and abandonment, turning out of doors and failure to support. At the hearing of the cause the learned trial judge granted to petitioner an absolute divorce, permanent alimony at the rate of $80 per month, and solicitors fees, $150. The decree was based upon abandonment, turning out of doors and failure to support. From this decree the defendant prayed an appeal to this court, which has been duly perfected, and errors assigned as follows:

"1.

"There is no evidence upon which to base the verdict or the finding of the court.

"2.

"The verdict or finding of the court is contrary to and directly against the greater weight or preponderance of the evidence.

"3.

"The evidence preponderates in favor of the defendant.

"4.

"The court erred in refusing to permit the defendant to show the age, health, and earning capacity of the complainant."

The first three assignments of error present but the single question to be reviewed on this appeal, that the evidence preponderates against the finding of facts and the decree of the trial judge.

It appears that petitioner and defendant were married on the 8th day of November, 1922, in the City of Nashville, Tennessee, and immediately after the marriage moved to Memphis, Tennessee, where they lived until the separation occurred. The defendant was employed in Memphis by the Ford Motor Company, his position being designated as "chief road man," and earned a salary of $275 per month. The alleged cruel and inhuman treatment complained of by petitioner consisted of alleged mental cruelty and humiliation, the result of the conduct of the defendant. It appears that about January, 1925, petitioner, by the full consent, and we think by a preponderance of the evidence, at the suggestion of the defendant and for purposes of economy, returned to her former home in Nashville and remained there several months, and during which time the de-

fendant sent her from $50 to $75 a month. During the time she was in Nashville she was living with the family of her father, Bishop Beauchamp. She states that she returned to her father's home in Nashville at the suggestion of defendant, as his business necessitated his being out of Memphis except week-ends or Sundays, and frequently for two or more weeks at the time, and that living expenses would be greatly reduced by her going to stay with her father in Nashville until the defendant could improve his financial condition. The defendant denies that the suggestion that petitioner return to her father's home was made by him, or that he consented to the arrangement, but he admits that during the time she was away and living in her father's home in Nashville that he furnished her from $50 to $75 per month for her support. This is referred to in the record as the first separation between the parties, and especially by the defendant. However, we do not find anything in the record to warrant the conclusion that a separation occurred between the parties at that time, but we think that by a preponderance of the evidence, together with the facts and circumstances the contention made by petitioner to the effect that this arrangement was agreed to for purposes of economy is sustained. After living in the home of her father in Nashville for several months she returned to her husband in Memphis, and they selected an apartment in Memphis, and continued to live together until the separation. Soon after her return two letters addressed to her husband at their former address in Memphis were delivered to the new address in Memphis during the absence of the defendant, and petitioner took the liberty of opening and reading these two letters, written by a young lady of Columbus, Mississippi. The two letters are contained in the record, one dated January 29, 1926, and the other January 30, 1926, and as those letters are made the special basis of mental cruelty, humiliation and mortification, together with certain other conditions to which we will refer, these two letters we deem it expedient to quote in full.

"1/29/26.

"Dearest:

"I came home tonight, dug up all your letters, and read every one of them again. I can't see why people destroy letters anyway, because I enjoy reading them the second or third time, just as much, if not more than I do the first time. Since I have never answered your last letter, you may, if you like, consider this an answer. Now I haven't anymore room to rake you over the coals anymore about telling lies about the times you have been down to see me. I did that same thing after you had gone. I hated to have to do it, but was positively necessary. In the first place, I was in a very serious mood that morning, and I didn't feel like talking in general to anybody. I did try to

be polite and answer Mr. Guess' question, but my mind had one of your spells and refused to be centered on anything. I guess he thinks I am just about as dumb as anybody can get.

Then T. C. Billups happened to be watching when you drove off, and therefore drew his own conclusions. He waited until I had gone to my desk to begin work and then came over with this question: 'Miss Miller, didn't you have a date with Mr. Early last night?' I answered with: 'No, sir, why do you think I had a date with Mr. Early?' Then he said: 'Well he came up missing and we looked the town over but we didn't find him. I had an idea you knew where he was.' I am glad we left when we did, because they certainly did intend to find you and I know from the remark Mr. Billups made that they came by here first. I hated to see you leave almost as much as I did before the difference between now and then is I knew you were going to Arkansas before and I didn't know when I would see you again, and this time you are not going so far. I thought just of 'you' Thursday morning, and not of 'Mr. Early of the Ford Motor Company.' I can't forgive myself for hurting your side pushing that Ford around, when I felt all of the time that you were going to do it. I hope it is better by this time. You are going to have to take better care of yourself or you are going to injure yourself seriously.

"There I go with another sermon. From the way I lecture sometime you would take me for a preacher.

"It has been awfully quiet here tonight in my room. In one of your letters I read tonight you said you had decided to live for yourself if for no one else. That is the way I want to hear you talk. Stick to that motto and you will come out O. K.

"Like mother's list of dont's:

"(1)   Don't pick your thumb to pieces.

"(2)   Don't forget to live for yourself, if for none else.

"(3)   Don't forget to take care of yourself.

"(4)   Don't forget

"ETHEL."

The other letter dated January 30, 1926, the next day after the first letter was written, is as follows:

"Dearest Jim:

"It is now past twelve and I have gone to bed, but I am not sleepy. I have been thinking of you, and I know that I can't sleep now if I lie down, so I am going to write you and then sleep. Perhaps you are wondering where I have been. I have been to the 'Student Prince.' Have you ever seen it? It is all so real, so true to life, I seemed to live in another world when I sat there and listened. The singing was wonderful. I

think I am what people generally call a creature of moods. Music always makes me think of all the vanished dreams and lost love in this world. You see, he was a king and his duty was to the Princess, his chosen bride, even tho he loved another who could never be his bride. Instead of making it unreal, as they do in the movies, he married the Princess instead of the other girl. Please forgive the reference, but you see why I thought of you—then too, the Princess' name was Margaret.

"I wonder where you are tonight and what you are doing. I expect you are lonesome, but I hope not. I wish you were here with me and we could talk our troubles over. Then we would both feel better. There is something peculiar and sweet about our friendship. In the first place, it is stolen forbidden fruit, and in the second place, you are different from the rest. I want to be happy. I haven't been real happy since I was a little girl, and now I wonder if I ever will be happy again. There seems to be something hollow on the inside that makes my life incomplete. I don't know what it is or how to satisfy that longing, but when I find out I believe I will be happy. Now I am just drifting along. I am thinking too seriously too, and maybe making you blue by having to read all of this, and all life is what we make it, and it all depends on how we take it. I would like very much to hear from you if you care to write.

"Goodnight,

"ETHEL."

The petitioner, after reading these letters, told the defendant that she had the letters and had read them, and the contents of the letters, and then hid them for safe keeping. The defendant found them, and he in turn hid them in a kodak where the petitioner later found them and kept them in her possession, and produced them at the trial of the case. The defendant denied that his relations with the writer of these letters had at any time been intimate, or more than casually friendly. He stated that the writer of the letter was employed by the Ford dealer at Columbus, Mississippi, and that he had met her there in the office on business trips. However, we think it evident from these letters that he was accustomed to call on her on his visits to Columbus, and that he was also accustomed to write to her. The letters indicate more than a mere casual acquaintance. From these letters it is evident that the writer knew that he was a married man and that his wife's name was Margaret. The reference in the letter to the play "Student Prince," who had married a Princess out of a sense of duty, but loved another woman, and with the further very significant statement that the Princess, whom the king married was named Margaret, this being the name of defendant's wife, coupled with the wish that defendant could be with her

that night to talk over their troubles, would indicate that defendant had already acquainted her somewhat with his married life. The other incidents in the record to sustain the charge of mental cruelty, have to do largely with the associates of defendants whom he frequently brought to the apartment for Sunday evening dinner, and probably at other times, and on which occasions the conduct of himself and friends was boisterous, and these were made drinking parties, often resulting in intoxication of the men friends and associates whom he persisted in bringing to the apartment for entertainment. It is shown that the family who occupied adjoining apartment in the same building knew of these parties and the boisterous conduct. It appears that the petitioner was a refined young woman, and reared in an atmosphere of culture and refinement, and that these boisterous friends and associates of the defendant whom he persisted in bringing to the apartment, were very distasteful to the petitioner. However, the learned trial judge held that this did not constitute such cruel and inhuman treatment as to warrant a divorce on that ground. While we concur in this conclusion of the learned trial judge, we can well understand that the conduct of the defendant, considering the character of the parties that he was giving, and where his wife had to be present, and prepared the food for the parties, and this in connection with the flirtations indulged in by the defendant, and especially with the writer of the two letters referred to, occasioned her great humiliation and mortification, and was no doubt largely responsible for her future course and the subsequent developments in their domestic affairs.

On the subject of abandonment and failure to support, the record discloses that early in June, 1926, on Sunday evening, the defendant started to leave the house with four bottles of beer or homebrew, stating that he was taking them to his friends who were having a party, and started out of the house with the four bottles of beer in his hand, and openly so that they could be seen by those living in adjoining houses and sitting on their porches. She states that he had already drunk three bottles of the beer, and that she tried to prevent him from taking these four bottles of beer out onto the street to the automobile because she did not want those sitting on the porches to see him, and tried to take the beer away from him in the house, and that they had a scuffle over it, and that he threatened to strike her with one of the bottles; that he left the house with the beer openly, and very much to her humiliation; that he had previously told her that he was not going to pay the rent on the apartment and that she would find the apartment on her hands. She states in view of this conduct and of this statement and of his threat to strike her she was greatly humiliated, and telephoned a Mr. Ledbetter, a kinsman, to come for her and take her to his home where she spent the

night, and that on the following morning she borrowed the money from Mr. Ledbetter to pay her expenses to Nashville to her father's home, and then went to the apartment, and found that the defendant had gone away on his trip to be gone two weeks, and that he only left a check for $5 for the housekeeping expenses during his absence. She did not take the check but wrote to a note to the defendant as follows:

"My dear Jim:

"I shall send for the rest of my clothes as soon as possible. You may feel perfectly safe in the assurance that everything in the apartment is yours. I hope that you will attain anything you may be striving for, and you have my best wishes for your success.

"Sincerely,
"Beauchamp."

She then took a few things, wearing apparel, in her handbag and left Memphis and returned to her father's home in Nashville. Shortly after she returned to Nashville, she states about ten days, but probably the latter part of July, she wrote a letter to the defendant. The letter was not produced, the defendant claiming he had destroyed it. She stated the substance of the letter, which is somewhat indefinite as to its terms, but the substance of which was that she desired to return to Memphis and talk over matters with him with the view of a reconciliation; that there was to be an excursion and that she wrote him the time that she would arrive in Memphis, and requested that he be there so that she could have a talk with him about their affairs. The defendant admits that he received this letter, but denies that the letter requested a reconciliation, but simply that she wanted to talk to him about an important matter, and he supposed from that which had previously occurred that she wanted to talk to him about a divorce. He replied to the letter, and this letter reflects much light on the real attitude of the defendant, and we think strongly corroberates the statement of petitioner that her letter to him was requesting a conference looking to a reconciliation, and her return to him, and in her language, "to make a go of it." The letter written by defendant to petitioner is dated August 5, 1926, and is as follows:

"Dear Margaret:

"I have just returned from my vacation and found your special on arriving. I cannot see the use of your coming to Memphis, and prefer that you do not. So far as I am concerned, I am through, and if you do not deem it advisable to apply for a divorce, then I shall. I never could live with you again and to be frank, have no desire to attempt it. We are both young and have lost several years that could have been spent better, but

the sooner the matter is terminated, the better. I also received an insulting letter from your father, I do not appreciate in the least. He mentioned some debts that he paid for you. I have paid one of the bills you sent me several weeks past and will forward you check for the other one as soon as I can have my account balanced. I do not expect to answer your father's letter. I am still on my vacation and have planned a trip for this week-end. I see no use in your coming, as nothing can change me. Any detail of it can be handled by mail. I trust you can see the matter in my light. I am, .

> "Sincerely,
> "James H. Early."

There are statements contained in the above letter that strongly, corroborate the statement of petitioner that she had written a conciliatory letter, and desired to see the defendant with the view of going back to him, and to have a reconciliation. His reply indicated a fixed determination not to live with her again. He states that there would be no use in her coming to see him, as nothing could change his attitude toward her. He also states that if she does not apply for a divorce that he would. He adds emphasis to his determination not to live with her when he says "I never could live with you again, and to be frank, have no desire to attempt it."

We think it very clear from the record, that the petitioner had considerable aggravation, and had been frequently humiliated by the conduct of the defendant. On the Sunday night that she left the apartment and went to the home of Mr. Ledbetter, a kinsman, to spend the night, there had been a very unpleasant situation occasioned by the conduct of the defendant in taking the four bottles of beer out of the house and onto the street, openly, where the act could be seen by neighbors, and this over her protest, together with the statement that he had previously made that he was going to give up the apartment, or that he was not going to pay rent on it any longer, and that she would have it on her hands. When taken in connection with his other conduct, and his correspondence with other women, the boisterous parties over her protest, she had considerable grounds for complainant, and in her aggravation she returned to her father's home. She did not take but a small amount of wearing apparel with her, leaving her trunks and wearing apparel at the apartment. After being in Nashville two or three weeks she evidently reconsidered upon reflection, and wrote the letter to the defendant requesting him to meet her in Memphis, and to be in the city so that she could have a personal talk with him looking to a reconciliation. As above stated, he definitely declined this request and refused to see her or to talk to her, but expressed a fixed determination not to live with her again. From the time she left and

went to Nashville he did not contribute anything to her support. This, we think, constituted abandonment, and turning out of doors, and failure to support. We think that she, is in all good faith, offered to return to him, and offered a reconciliation. .

In 19 C. J., p. 67, on the subject of "Rejection of offer of Reconciliation as desertion," the rule is stated: "Where there are no insurmountable reasons why a husband and wife should not live together, if one of them offers a reconciliation, in good faith, free from improper qualifications and conditions, and within the statutory period of desertion, its rejection amounts to desertion, and this is true, although the party thus refusing to resume the marital relation was not originally the offender, provided that the cause of the separation has been removed. . ."

The fourth assignment of error which complains of the action of the court in refusing to permit the defendant to show the age, health and earning capacity of the complainant, is too general, and the evidence complained of, or where it is contained in the record is not set out under this assignment of error. However, we think these matters were wholly immaterial on the question of alimony, since it appears that the petitioner did not have any property of her own. The defendant earns $275 per month. The petitioner has no property of her own, and we know of no rule that would require her to seek employment or to engage in employment if the defendant is financially able to pay alimony in the amount fixed by the court.

It results that all assignments of error are overruled and the decree of the Chancellor is affirmed. Appellant and sureties on the appeal bond will pay the cost of this appeal.

The cause is remanded to the circuit court of Shelby county for the purpose of enforcing the decree for alimony.

Owen and Heiskell, JJ., concur.